FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

FEB 21 2012

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

-JEC

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
   [ATLANTA DIVISION]
- - - - - - - - - - - - - - -X
CHRISTOPHER P. JAMISON,
JOHN CARTWRIGHT,
DAVID EDWARD MARCU, and
TOMMIE D. BENEFIELD, JR.,

              Plaintiffs,

       -v.

AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL, and LEE MOAK,
as President of Air Line
Pilots Association,
International,

              Defendants.

- - - - - - - - - - - - - - -X

COMPLAINT

1:12-CV-0544

2012 CV _____ (      )

## JURY DEMAND:
## PLAINTIFFS DEMAND TRIAL BY JURY
## OF ALL ISSUES TRIABLE OF RIGHT BY A JURY

       Plaintiffs CHRISTOPHER P. JAMISON, JOHN CARTWRIGHT, DAVID

EDWARD MARCU, and TOMMIE D. BENEFIELD, each acting *pro se*,

complaining of the defendants herein, AIR LINE PILOTS

ASSOCIATION, INTERNATIONAL and LEE MOAK, as President of Air

Line Pilots Association, International, as and for their

Complaint, respectfully allege as follows:

## JURISDICTION AND VENUE

1.   This Court has proper jurisdiction to entertain the claims set forth herein by virtue of 28 U.S.C. sec. 1331 (federal question jurisdiction); and by virtue of section 301(b) of the Labor Management Relations Act (29 U.S.C. sec. 141 et seq.); the Labor Management Reporting Disclosure Act ["LMRDA"] (29 U.S.C. sec. 401 et seq.); 28 U.S.C. sec 1337(a;); the Railway Labor Act ["RLA"] (45 U.S.C. sec. 151 et seq.); and by virtue of the Court's equitable, pendent, and supplemental jurisdiction (28 U.S.C. sec. 1367).

2.   This Court is a proper venue for the claims set forth herein pursuant to 28 U.S.C. sec. 1391, by virtue of the fact that each defendant does business within this district, in that:

a) Defendant AIR LINE PILOTS ASSOCIATION, INTERNATIONAL [hereinafter sometimes referred to as "ALPA"] represents thousands of pilots who are based at Hartsfield-Jackson Atlanta International Airport, which is located within this district, and that it actually conducts business within this district by virtue of the fact that it extends representation to pilots concerning a broad range of activities within this district.

b)  The representation by the AIR LINE PILOTS ASSOCIATION, INTERNATIONAL of its members, including each of the

2

plaintiffs herein, extends to all of its members' professional

flying activities, including those times at which they would fly

to and from an airport or airports within this district;

c) Defendant LEE MOAK, who is sued in his

representational capacity only, is, and has been since January

1, 2011, the President of the AIR LINE PILOTS ASSOCIATION,

INTERNATIONAL, and flies to and from this State and, in

particular, this judicial district, frequently in order to carry

out the business affairs and activities of the Air Line Pilots

Association, International.

## THE PARTIES

### Plaintiffs

3.   Each of the plaintiffs herein is a pilot who was hired

by AirTran Airways, Inc. ["AirTran"] and has been employed by

such carrier for many years.

4.   The terms and conditions of the employment of each

such plaintiff, and of all AirTran pilots, was at all pertinent

times referred to herein and is governed by a collective

bargaining agreement between AirTran Airlines and the pilots as

represented by the Air Line Pilots Association, International.

5.   At all pertinent times referred to herein, all of the

plaintiffs herein were residents of various jurisdictions

throughout the United States and employed by AirTran

Airlines.

3

6.    Plaintiff CHRISTOPHER P. JAMISON ["Jamison"] is a domiciliary of Warrenton, Virginia.

7.    Plaintiff Jamison first became employed by Valujet, AirTran's predecessor, in or about 1993, before the 1997 merger of the two airlines.

8.    Plaintiff JOHN CARTWRIGHT ["Cartwright"] is a domiciliary of Watkinsville, Georgia.

9.    Plaintiff Cartwright first became employed by AirTran in or about early 2000.

10.   Plaintiff DAVID EDWARD MARCU ["Marcu"] is a domiciliary of Killen, Alabama.

11.   Plaintiff Marcu first became employed by AirTran on or about *.

12.   Plaintiff TOMMIE D. BENEFIELD ["Benefield"] is a domiciliary of Jacksonville, Florida.

13.   Plaintiff Benefield first became employed by Valujet, AirTran's predecessor, in or about 1994, before the 1997 merger of the two airlines.

14.   In addition to the plaintiffs herein, as many as approximately 1,700 AirTran pilots were similarly situated, and suffered damage to their earnings and their professional careers in like manner as those named as plaintiffs herein, and the complaint herein can be expected to be amended to include a large number of additional plaintiffs.

4

## Defendants

15.  At all pertinent times referred to herein, defendant
AIR LINE PILOTS ASSOCIATION, INTERNATIONAL [hereinafter,
alternately, "ALPA" or the "Union"] was and is an unincorporated
association acting as a labor union.

16.  ALPA is the largest airline pilot union in the world
and represents some 53,000 pilots at dozens of airlines in the
United States and Canada.  It is chartered by the AFL-CIO and
the Canadian Labour Congress, and is a member of the
International Federation of Air Line Pilot Associations.

17.  ALPA is a labor organization and is the certified
representative of employees under the provisions of the Railway
Labor Act.

18.  Upon information and belief, ALPA's principal place of
business is in Herndon, Virginia.

19.  Upon information and belief, ALPA maintains offices in
other locations, including in Washington, D.C.

20.  At all pertinent times referred to herein, defendant
LEE MOAK was and is President of defendant ALPA, having begun
his tenure as President on or about January 1, 2011.

21.  At all pertinent times referred to herein, defendant
Lee Moak maintained and still does maintain an office in
Washington, D.C. and travels to various jurisdictions, including
this district, in pursuit of his official duties.

22.  Defendant Moak is sued herein in his representational capacity only, and no damages are herein sought from Moak's personal funds.  Nor are damages sought from Moak separate and apart from the damages claims interposed against the Union.

## ALPA'S REPRESENTATIONAL STRUCTURE

23.  In addition to its national office, ALPA acts through a "Master Executive Council" ["MEC"] at each airline at which it extends representation.

24.  Such MEC serves as the coordinating council for ALPA membership at the particular airline.

25.  Each ALPA MEC, comprised of pilots for the respective carrier, is authorized to act on behalf of ALPA with regard to representing pilots on the property of the respective airline.

26.  ALPA conducts business in numerous locations, including at the offices of each MEC at each of the approximately 48 airlines at which ALPA provides representation throughout the United States and Canada.

27.  At all pertinent times referred to herein, ALPA constituted a "representative" within the meanings set forth in both the Railway Labor Act ["RLA"] and the Labor-Management Reporting Disclosure Act ["LMRDA"].

28.  At all times referred to herein, ALPA was the exclusive bargaining representative of each of the plaintiffs

herein, as well as all, or virtually all, other approximately 1,700 TransAir pilots.

29. ALPA's representation of the AirTran pilots requires that it serve as a party to the pilots' collective bargaining agreement, setting forth the rates of pay, rules, and working conditions for the pilots.

30. At all pertinent times referred to herein, the AirTran MEC was designated as the coordinating council for the ALPA membership at AirTran and, as such, was empowered to take an array of actions in order to address concerns of AirTran pilots.

31. At all pertinent times referred to herein, the AirTran ALPA MEC was empowered to participate in collective bargaining activities with AirTran management.

32. The AirTran MEC serves under the auspices of ALPA's national offices and officers.

33. In addition, no collective bargaining agreement or any document by which a collective bargaining agreement is modified, supplemented, or amended (including any letter of agreement) may be given effect unless and until it has been signed by ALPA's President.

34. ALPA extends representation to pilots at various airport "domiciles" throughout the United States, including at virtually every major airport in the nation and at airport

7

domiciles within this district such as Hartsfield-Jackson
Atlanta International Airport.

35.   ALPA's members live in various states and provinces,
and, upon information and belief, reside in every state in the
United States and in at least certain provinces of Canada.

36.   The instant complaint arises from issues surrounding
the seniority integration process emanating from the merger of
the seniority lists of Southwest and AirTran.

BACKGROUND

## The Merger Plan

36.   In or about late September 2010, Southwest Airlines
Co. [hereinafter, "Southwest"] announced that it would acquire
the stock and assets of AirTran Holdings, Inc., the then-parent
company of AirTran.

37.   At that time, a merger agreement was entered into
between the parties.

38.   Southwest was a much larger carrier, employing some
37,000 persons, including more than 6,000 pilots, operating more
than 3,300 flights daily on its 550 aircraft, and tallying
approximately 1.1 million departures in a recent calendar year.
AirTran, on the other hand, had some 250,000 departures annually
and employed approximately 1,600 pilots.

39.   Southwest traditionally flies only B-737 aircraft (and
is recognized as the largest operator of that equipment

8

worldwide, with some 550 such aircraft in service), while
AirTran has about 140 aircraft, comprised of some 88 B-717's and
52 B-737-500's.

40.   Southwest's purchase of AirTran permits Southwest to
expand to some 38 additional destinations, eliminate a low-cost
competitor, provides it with landing slots in the New York and
Washington, D.C. areas, and gives it access to Atlanta.

## The Importance of Seniority

41.   A pilot's seniority within his or her airline system
is governed by the collective bargaining agreement between his
or her respective employer carrier, on the one hand, and his or
her union, on behalf of the pilots at the particular carrier.

42.   The collective bargaining agreement [hereinafter,
"Pilots Working Agreement"] is comprised not only of the main
agreement, but also incorporates any side letters or letters of
agreement that modify or supplement such Pilots Working
Agreement.  Each such agreement, whether the main agreement or
any letters of agreement modifying or supplementing the Pilots
Working Agreement, does not bind the parties and is not given
effect unless and until it is signed by the President of ALPA.

43.   The importance of seniority to airline pilots employed
by United States-based carriers is resounding:  Furloughs are
based exclusively upon where a pilot stands on the given
airline's system seniority list, and many airlines, over the

9

years, have had pilots who were on furlough for several years at a time.  Sometimes a single seniority number can spell the difference between continued employment, productivity, and advancement, on the one hand, and an elongated furlough, on the other.

44.  In addition, under most or all collective bargaining agreements in the aviation industry, employment opportunities for pilots are awarded through competitive, seniority-based bidding.

45.  The seniority standing of any given pilot determines, among other things, his or her pay level; whether a pilot serves as captain or as first officer; the type of aircraft the pilot may fly; and the routes that are open to that pilot (such as domestic or international).Various other perquisites incidental to employment are also based upon a pilot's relative seniority.

46.  Virtually *every* aspect of a pilots' flying career is governed and incalculably affected by his or her seniority within the particular airline system in which the pilot is employed.

47.  The opportunity for pilots to move laterally between one United States-based airline and the other is non-existent, with the occasional exception of mergers and of equipment acquisitions.  If a pilot were to leave his or her carrier for virtually any reason, he or she would, essentially, have to

10

start over as a new-hire at another airline.  In other words,
if, say, a US Airways captain with 25 years experience and who
flies his airline's largest equipment were to leave his job and
seek employment at, say, Delta Air Lines, Inc., he would have to
take a job flying as first officer on Delta's smallest
equipment, and would be at the very bottom of the seniority
list, flying undesirable routes and with eminent risk of
furlough.

48.  It is, thus, unsurprising that the process of
seniority integration of two pilot seniority lists is typically
a fraught, contentious, and emotional issue to pilot groups.

## The Seniority Integration Process

49.  In or about April 2011, a "Seniority Integration
Process Agreement" [the "Process Agreement"] was entered into by
the four "players" in the process:  Southwest, AirTran, the
Southwest Airlines Pilots' Association (the labor union for the
Southwest pilots), on behalf of the Southwest pilots, and ALPA
on behalf of the AirTran pilots.  The Process Agreement was
signed by authorized representatives on behalf of each entity,
and was signed, as is required, by the President of ALPA.

50.  On or about May 2, 2011, Southwest completed its
acquisition of AirTran by purchasing all outstanding common
stock and other assets of AirTran Holdings, Inc.

51.  The merger agreement provided, in pertinent part, that

11

AirTran was to become a wholly-owned subsidiary of Southwest once a series of corporate and regulatory hurdles were overcome.

52.   Such a merger agreement has traditionally triggered seniority integration procedures.  Since the end of 2007, the Federal Aviation Act has included certain protections known as the McCaskill-Bond Amendment ["McCaskill-Bond"], 49 U.S.C. § 42112.  That statute, entitled "Labor requirements of air carriers," is triggered by the merger process and guarantees invocation of the Allegheny-Mohawk Labor Protective Provisions, which provide for "fair and equitable" integration of seniority lists.  [Specifically, sections 3 and 13 of the labor protective provisions imposed by the Civil Aeronautics Board in the Allegheny-Mohawk merger (as published at 59 C.A.B. 45) apply to the integration of employee seniority lists].

53.   McCaskill-Bond recognizes arbitration as one method to integrate seniority lists, but, consistent with traditional policy in airline mergers, also recognizes the availability of alternative methods.  Such alternative methods include a negotiated outcome.

54.   The Process Agreement provided, in pertinent part, that the parties "desire to utilize an alternative process . . . for creation of an Integrated Master Seniority List" and

> also wish to provide for the orderly
> combination of Southwest Pilots and
> AirTran pilots under a single Collective

> Bargaining Agreement ("CBA") and
> representation by a single collective
> bargaining representative within a single
> transportation system under the Railway
> Labor Act. . . .

55.  The Process Agreement, by its terms, recognized the
authority of the Merger Committees of both unions (SWAPA and
ALPA) to "reach agreement" and to "reach a complete agreement
regarding the integration of their respective seniority lists,"
and provided that Southwest would accept such agreement.

56.  The Process Agreement further provided that "SWAPA and
ALPA agree to submit the complete agreement to their respective
memberships for ratification" and that "Both the SWAPA and ALPA
ratification votes will close on the same date and time, and the
results will be announced simultaneously."

57.  The Process Agreement was consonant with typical
seniority integration procedures in recognizing the autonomy of
a Merger Committee.  Under ALPA's merger policy, as set forth in
its Administrative Manual, for example, the Merger Committee is
given full authority to act on behalf of the flight deck crew
members of the respective airline in concluding a single pilot
system seniority list.

## The Role of the Merger committee

58.  The AirTran MEC Policy Manual, effective June 9, 2010,
provides, in pertinent part, that after a merger is announced,
Merger Committee members are to "[p]rosecute for an equitable

13

seniority integration in accordance with ALPA Merger Policy, with particular emphasis on protecting the seniority and standard of living of all AirTran Airways pilots."

59.   It is recognized and understood that a Merger Committee at an ALPA carrier is to operate autonomously, and, although appointed or confirmed by the MEC, is to use its own judgment with regard to pursuing its role and responsibilities in a merger.

## Details On the Integration & Transition Agreements

60.   Members of the two unions' respective Merger Committees met on May 13, 2011 in the office of Joe Harris, Southwest's Vice President of Labor and Employee Relations to commence negotiations on an integrated seniority list.

61.   Two months later, on July 12, 2011, Southwest presented a sweeping seniority integration and transition plan to the two Merger Committees.

62.   At that time, Southwest officials asked that the AirTran MEC and Merger Committee members, along with representatives of the Southwest pilots' union, meet in Dallas, Texas on July 14, 2011 with Southwest Chief Executive Officer Gary Kelly and other top Southwest officers.

63.   At The July 14, 2011 meeting, Kelly and other Southwest officials emphasized their desire for every AirTran

14

pilot to have the opportunity to vote as to whether to ratify
the seniority integration proposal.

64.   Kelly and the other Southwest officers underscored
the importance of prompt action (particularly in light of
worsening financial conditions), and their belief that seniority
integration was preferable but hardly necessary.  He told those
in attendance that what was on the table was "better
comprehensively than anything in arbitration" and that if fuel
prices continued to rise, he "may not be able to make the same
deal."

65.   Kelly also told the AirTran MEC and Merger Committee,
among others, that, "There is a risk to not optimizing routes.
The deal is off in the Spring."  He also said, "We can choose
not to integrate," especially because the B-717 (which
constituted the majority of AirTran aircraft) is not an airplane
he likes.  Thus, he said, "Why integrate them without a deal?"
He also indicated that AirTran's B-717's were leased from Boeing
and that he would reserve judgment on the B-717 fleet if there
is not a seniority integration agreement.

66.   Kelly also said that the proposal favored AirTran
pilots to the maximum extent possible.  "We either integrate or
we won't," he told the pilot leaders.

67.   It was clear to union negotiators that Southwest
wished to avoid the hostility, infighting, and delays that often

accompany the process of seniority integration.  Indeed, the hostility that followed the 1980 acquisition by Pan American World Airways, Inc. of National Airlines, Inc. lasted through the time when Pan Am ceased operations on December 4, 1991.  And the 2005 merger of US Airways, Inc. and America West Airlines, Inc. has spawned a myriad of litigaton, but not yet any operational integration.

68.  In the meantime, the ALPA Merger Committee reached unanimity in support of the seniority integration package, announcing on July 16, 2011 that an agreement in principle had been reached with Southwest and the Southwest pilots' union as to seniority integration and a transition agreement.

69.  That same day, the Merger Committee sent an e-mail communiqué to all AirTran pilots, stating, "The Merger Committee believes that this is a fair agreement that provides career protection for AirTran pilots, as well as significant economic gains."

70.  Among the economic gains recognized by the Merger Committee members were enormous pay increases, averaging about $72,000 per year for captains and about $48,000 per year for first officers, with such pay increases to begin by April 2012. For some pilots, their pay would be nearly doubled.

71.  Other advantageous features of the seniority integration agreement and transition agreement were:

- Substantial furlough protection, such that one Southwest pilot would be furloughed for each AirTran pilot furloughed, despite the fact that there were a large number of AirTran first officers at the bottom of the proposed merged seniority list;

- The Atlanta base would be protected for another nine years, permitting AirTran pilots the stability of remaining at their base and, thus, not disrupting their families' lives;

- AirTran captains would be afforded priority as to all captain vacancies at the Atlanta base until September 2020;

- The Atlanta base would be staffed in larger numbers than more typical Southwest domiciles;

- A large number (851) of AirTran capatain seats would be protected;

- AirTran pilots would be protected against being displaced for positions by more senior Southwest pilots.

## ALPA Counsel Champions Full Ratification Vote

72.   At about the same time, the MEC was advised by ALPA counsel that pilots should have the opportunity to ratify the seniority integration package, and that disallowing such a ratification vote might result in just such a litigation as this.

73.   Seeking to quell increasing anxiety among pilots, who still awaited full reportage on the package that was being developed, the ALPA MEC on July 21, 2011 assured pilots that details would be forthcoming.  An e-mail on that date indicated

17

that if the MEC were to vote to send the agreement to the
pilots, the Merger Committee would meet with pilots at various
domiciles to answer questions, and that each pilot would be
given a full copy of the agreement.  The e-mail stated, in
pertinent part,

> The MEC understands that pilots are
> anxious and want details sooner than
> later; however, it is readily apparent
> that a full and honest discussion cannot
> take place without all of the facts on
> the table, and that cannot happen until
> the agreement is complete.

74.  The ALPA Merger Committee announcement, together with
the MEC e-mail thus lulled the AirTran pilots into a false sense
of security that they would be given the opportunity to review
documents, ask questions, and vote to ratify the package.

75.  In the days following July 16, 2011, the agreement in
principle developed into a full-fledged package.

76.  Meanwhile, the MEC delayed its meeting to determine
whether to allow pilots a ratification vote, seemingly running
out the clock on the seniority integration package.

## ALPA Executive Vice President Weighs In

77.  In a highly-unusual move, ALPA Executive Vice
President Todd Ortscheid wrote to the MEC (in a letter widely
publicized to line pilots as well), at the end of July 2011 and
later posted information on an ALPA pilot web forum, claiming
that he was not writing as an ALPA officer but just sharing

18

"nothing more than my own personal thoughts as a line pilot at AirTran." His letter dismissed Kelly's comments about the seniority integration plan as a "hollow and over-the-top" way of creating an "artificial and completely unrealistic deadline" in which Southwest would "watch the union trip over its proverbial dick to meet the fake deadline and avoid the 'consequences' of the fake threat."

78. Ortscheid lambasted any effort to accept the seniority integration agreement as nothing more than an effort by AirTran pilots to "flush all of our own careers down the toilet" and denounced the proposed agreement as an "embarrassment."

79. Ortscheid, allegedly speaking only for himself and not ALPA, wrote,

> Too many of you are talking about how
> 'the pilots need to be able to decide
> for themselves.' Execute me, but bullshit.
> Direct democracy is nothing more than two
> wolves and a sheep voting on what to have
> for dinner... . The MEC must do the right
> thing and protect the pilots by voting this
> agreement down at the MEC level and sending
> the Merger Committee back to the table, or
> to arbitration, whichever the case may be.

80. On the pilot web forum, read by hundreds of AirTran pilots, Ortscheid wrote, inexplicably, "There isn't the slightest chance in hell that an arbitrator would award anything less than date of hire." He also wrote, "Not going to arbitration is crazy."

81.  Despite expressing strident, and needlessly impetuous, convictions about the likely outcome of rejecting the seniority integration plan, Ortscheid maintained that he took no position whatsoever as an executive vice president of ALPA and denied that he was serving as a stalking horse for ALPA National.

82.  However, upon the integration of the AirTran pilots into a single Southwest seniority list and the consummation of a single collective bargaining agreement, ALPA would have little likelihood of becoming the exclusive bargaining representative for the combined pilot group and would thus also lose its AirTran members, who would become members of SWAPA.

83.  Arbitration, on the other hand, can be an elongated process and sometimes can lead to extraordinary delays, such as at US Airways, where an arbitration award was issued almost five years ago but has yet to be implemented and nonetheless led directly to the ouster of the union that represented the larger pilot group.

## MEC Member Denies Management Threats

84.  MEC Member Anthony Chilla wrote to all AirTran pilots on or about August 1, 2011, stating, in pertinent part,

> There is much speculation that Gary Kelly
> has threatened our jobs.  Quite the
> contrary, Mr. Kelly stated emphatically in
> his meeting with the MEC in Dallas that
> 'we plan to integrate the two companies;
> there is no Plan B.'  I don't know how much
> clearer it can be.  Anything you're hearing

out there to the contrary is nothing but
rumor and fear mongering.

85.  It was clear, however, that Chilla's reportage and
characterizations were simply fabricated.

86.  Merger Committee members, as well as other MEC
members, who had participated in the July 14 meeting with Kelly,
however, knew that Chilla had misrepresented statements that
Kelly had made.  The MEC nonetheless took no steps to have
Chilla retract or even clarify his remarks.

## Merger Committee Muzzled by MEC

87.  By August 11, 2011, only seven days prior to a planned
MEC meeting at which it would be determined whether the package
would be sent to the pilots for a full ratification vote, the
full seniority integration agreement was published.

88.  The MEC, in the meantime, kept the Merger Committee
from any further comments or briefing on the package.  One
Merger Committee member was harshly critized by the MEC for
briefing a few pilots at his home.

89.  Instead, the MEC first unmuzzled -- if only slightly -
- the Merger Committee on August 17, 2011, the day before the
MEC was to decide whether pilots could ratify the proposal.

90.  At the August 17, 2011 meeting, the ALPA Merger
Committee was prevented by the MEC from showing a Powerpoint
presentation that included specific remarks made by top

Southwest officers at the July 14, 2011 meeting.  Over the
objections of Merger Committee members, the MEC flat-out refused
to permit the showing of the presentation, which, upon
information and belief, was in stark contravention to the advice
that ALPA counsel had given to the MEC.

91.  That same day, during a brief recess in the meeting, a
Merger Committee Member answered questions for a group of about
15 pilots, noting, in particular,

> We have been chomping at the bit to hold
> this type of meeting with you guys so you
> could ask everything you want, but the MEC
> has kept us from doing so.

92.  The August 17 meeting became something of a charade,
with one pilot leader -- while sitting on the dais with the MEC
members -- feeding questions to an opponent of the seniority
integration package.

93.  The August 17 meeting ended ominously, with pilots who
attended being rather certain that a ratification vote by the
pilots would never see the light of day.

## MEC Decision Spurs Southwest Rescission of Offer

94.  The following day, August 18, 2011, the MEC voted,
almost unanimously, to deprive the pilots of a ratification
vote.

95.  Within days of the MEC vote, Southwest management
withdraw the seniority integration package.

96.   Southwest CEO Kelly responded in the manner he had promised on July 14, 2011, stating, on August 22, 2011, that,

> I was disappointed that ALPA chose to
> reject the deal.  I thought it was very
> well done and required some give and take
> on all parts, but it was certainly a very,
> very generous offer.  The economy is in
> terrible shape and we have alarmingly high
> fuel costs, so this simply gives us an
> opportunity to take a step back and take
> a deep breath and revist our integration
> plans going forward.... We've withdrawn
> our offer, in light of the current
> economic circumstances. . . . You know,
> this means that the integration process
> will continue, but will definitely work
> at a much slower pace.  The whole idea
> behind that Agreement was to get
> expedited integration. . . . Ultimately,
> we're going to do what's in the best
> interest of our Southwest Airlines
> culture and our business or both.

## The Watered-Down Seniority Integration Plan

97.  At a meeting in Dallas between Southwest management and Merger Committee members on September 1, 2011, Southwest offered a broad outline of a second seniority integration package.

98.  The second plan, the Merger Committee members were told, would not be formally offered unless the ALPA MEC approved the package "sight unseen," thus guaranteeing a full pilot ratification vote.

99.  On or about September 3, 2011, the same MEC members who previously rejected, in a seven-to-one vote, the first

seniority integration plan, now voted unanimously for a plan the
details of which were as yet unknown to them.

100.   About three quarters of Atlanta-based pilots voted,
by October 11, 2011, to recall three Atlanta MEC representatives
who had voted to disapprove the earlier seniority integration
package.

101.   After the details of the new seniority integration
plan became known, one Merger Committee member described the
package as "all of the bad" of the first package, "with none of
the good."

102.   On November 7, AirTran pilots overwhelmingly approved
(with some 83 percent of voting pilots casting their ballots in
favor of ratification) the second seniority integration package.

103.   One of the key differences between the first and
second seniority integraton packages is that the first would
have resulted in immediate, and sharp, pay increases for AirTran
pilots, while the second package tables those increases for
about three years.

104.   Upon information and belief, had the AirTran pilots
been given the opportunity to ratify the first seniority
integration package, it would have been overwhelmingly approved,
and, at any rate, the ratification would have been successful.

COUNT I
BREACH OF THE DUTY OF FAIR REPRESENTATION
[Against AIR LINE PILOTS ASSOCIATION, INTERNATIONAL and LEE MOAK
as President of Air Line Pilots Association, International]
Damages Sought: At least $200,000 For Each Pilot

105.  Plaintiffs repeat and reallege each and every allegation set forth in paragraphs "1" through "104" hereof, with like force and effect as though set forth at length herein.

106.  By withholding information about the terms, conditions, and exceptional advantages of the first seniority integration package, ALPA sought to circumvent pilot enthusiasm about the plan.

107.  In so doing, ALPA set out to prevent a groundswell of support by line pilots at AirTran from forcing the union to send the plan out to pilot ratification.

108.  ALPA thus denied pilots the opportunity to vote to ratify a package that would have tremendously affected their careers and their livelihoods, without so much as an explanation to the pilots.

109.  In acting as it did, ALPA breached its duty of fair representation to its members by acting in a manner that was characterized by bad faith.

110.  In acting as it did, ALPA breached its duty of fair representation to its members by acting in a manner that was characterized by arbitrariness.

111. By virtue of the foregoing, each plaintiff (and, for that matter, each AirTran pilot) has been damaged in a sum to be determined at trial but in no event less than Two Hundred Thousand ($200,000.00) Dollars each.

## COUNT II
### BREACH OF THE DUTY OF FAIR REPRESENTATION
[Against AIR LINE PILOTS ASSOCIATION, INTERNATIONAL and LEE MOAK as President of Air Line Pilots Association, International]
Damages Sought: At least $200,000 For Each Pilot

112. Plaintiffs repeat and reallege each and every allegation set forth in paragraphs "1" through "111" hereof, with like force and effect as though set forth at length herein.

113. The ALPA MEC signed off on an agreement by which both the Southwest Airlines Pilots Association and ALPA "agree to submit the complete agreement to their respective memberships for ratification."

114. Despite that agreement, and the concomitant assurance to the AirTran pilots that such a ratification vote was forthcoming, ALPA deprived the pilots of the opportunity to ratify the seniority integration package.

115. In acting as it did, ALPA breached its duty of fair representation to its members by acting in a manner that was characterized by bad faith.

116. In acting as it did, ALPA breached its duty of fair representation to its members by acting in a manner that was characterized by arbitrariness.

26

117.  By virtue of the foregoing, each plaintiff (and, for that matter, each AirTran pilot) has been damaged in a sum to be determined at trial but in no event less than Two Hundred Thousand ($200,000.00) Dollars each.

COUNT III
BREACH OF THE DUTY OF FAIR REPRESENTATION
[Against AIR LINE PILOTS ASSOCIATION, INTERNATIONAL and LEE MOAK
as President of Air Line Pilots Association, International]
Damages Sought: At least $200,000 For Each Pilot

118.  Plaintiffs repeat and reallege each and every allegation set forth in paragraphs "1" through "117" hereof, with like force and effect as though set forth at length herein.

119.  The ALPA MEC withheld information from the AirTran pilots as to the terms of the seniority integration package.

120.  The ALPA MEC also withheld information from the AirTran pilots as to an array of comments that were made by Southwest's chief executive officer and other top officials of Southwest.

121.  In so doing, the ALPA MEC kept AirTran pilots from fully understanding the risks association with rejection of the seniority integration package.

122.  In acting as it did, ALPA breached its duty of fair representation to its members by acting in a manner that was characterized by bad faith.

123.  In acting as it did, ALPA breached its duty of fair

27

representation to its members by acting in a manner that was characterized by arbitrariness.

124.  By virtue of the foregoing, each plaintiff (and, for that matter, each AirTran pilot) has been damaged in a sum to be determined at trial but in no event less than Two Hundred Thousand ($200,000.00) Dollars each.

COUNT IV
BREACH OF THE DUTY OF FAIR REPRESENTATION
[Against AIR LINE PILOTS ASSOCIATION, INTERNATIONAL and LEE MOAK
as President of Air Line Pilots Association, International]
Damages Sought: At least $200,000 For Each Pilot

125.  Plaintiffs repeat and reallege each and every allegation set forth in paragraphs "1" through "124" hereof, with like force and effect as though set forth at length herein.

126.  ALPA representatives withheld information to pilots and, worse yet, misrepresented to AirTran pilots the force and effect of comments made by Southwest executives during the July 14, 2011 meeting.

127.  ALPA thus lulled the AirTran pilots into a false sense of security that they were at little risk in the event the seniority integration package was not approved.

128.  In acting as it did, ALPA breached its duty of fair representation to its members by acting in a manner that was characterized by bad faith.

28

129. In acting as it did, ALPA breached its duty of fair representation to its members by acting in a manner that was characterized by arbitrariness.

130. By virtue of the foregoing, each plaintiff (and, for that matter, each AirTran pilot) has been damaged in a sum to be determined at trial but in no event less than Two Hundred Thousand ($200,000.00) Dollars each.

### COUNT V
### BREACH OF THE DUTY OF FAIR REPRESENTATION
[Against AIR LINE PILOTS ASSOCIATION, INTERNATIONAL and LEE MOAK as President of Air Line Pilots Association, International]
Damages Sought: At least $200,000 For Each Pilot

131. Plaintiffs repeat and reallege each and every allegation set forth in paragraphs "1" through "130" hereof, with like force and effect as though set forth at length herein.

132. Upon information and belief, ALPA deployed Todd Ortscheid, an Executive Vice President of the union, as a stalking horse to dissuade the MEC from putting out the seniority integration package for pilot ratification.

133. Upon information and belief, ALPA deployed Todd Ortscheid, an Executive Vice President of the union, as a stalking horse to dissuade the ALPA MEC and/or AirTran pilots from recognizing that the seniority integration package would have been a highly favorable outcome for the AirTran pilots.

134. In so doing, ALPA sought, falsely, to credit arbitration as an effective manner in which to protect the

29

seniority rights of pilots employed by a financially ailing

airline and one which employed far fewer pilots than Southwest.

135.   In so doing, ALPA sought, falsely, to make it sound

as though an arbitrator would view a date-of-hire approach as a

*fait accompli*, when, in fact, the recent history of seniority

integration arbitration proceedings is riddled with cases in

which date-of-hire has been largely or entirely disregarded.

136.   In acting as it did, ALPA breached its duty of fair

representation to its members by acting in a manner that was

characterized by bad faith.

137.   In acting as it did, ALPA breached its duty of fair

representation to its members by acting in a manner that was

characterized by arbitrariness.

138.   By virtue of the foregoing, each plaintiff (and, for

that matter, each AirTran pilot) has been damaged in a sum to be

determined at trial but in no event less than Two Hundred

Thousand ($200,000.00) Dollars each.

### COUNT VI
### BREACH OF THE DUTY OF FAIR REPRESENTATION
[Against AIR LINE PILOTS ASSOCIATION, INTERNATIONAL and LEE MOAK
as President of Air Line Pilots Association, International]
Damages Sought: At least $200,000 For Each Pilot

139.   Plaintiffs repeat and reallege each and every

allegation set forth in paragraphs "1" through "138" hereof,

with like force and effect as though set forth at length herein.

140.   The ALPA MEC deliberately and intentionally disregarded viable and disinterested advice by counsel that it permit the pilots to vote as to whether to ratify the first seniority integration package.

141.   In acting as it did, ALPA breached its duty of fair representation to its members by acting in a manner that was characterized by bad faith.

142.   In acting as it did, ALPA breached its duty of fair representation to its members by acting in a manner that was characterized by arbitrariness.

143.   By virtue of the foregoing, each plaintiff (and, for that matter, each AirTran pilot) has been damaged in a sum to be determined at trial but in no event less than Two Hundred Thousand ($200,000.00) Dollars each.

<u>COUNT VII</u>
BREACH OF THE DUTY OF FAIR REPRESENTATION
[Against AIR LINE PILOTS ASSOCIATION, INTERNATIONAL and LEE MOAK
as President of Air Line Pilots Association, International]
<u>Damages Sought: At least $200,000 For Each Pilot</u>

144.   Plaintiffs repeat and reallege each and every allegation set forth in paragraphs "1" through "143" hereof, with like force and effect as though set forth at length herein.

145.   The ALPA MEC deliberately and intentionally disregarded viable and disinterested advice by counsel that it share with AirTran pilots the array of comments made by Southwest executives at the July 14, 2011 meeting.

31

146. In acting as it did, ALPA breached its duty of fair representation to its members by acting in a manner that was characterized by bad faith.

147. In acting as it did, ALPA breached its duty of fair representation to its members by acting in a manner that was characterized by arbitrariness.

148. By virtue of the foregoing, each plaintiff (and, for that matter, each AirTran pilot) has been damaged in a sum to be determined at trial but in no event less than Two Hundred Thousand ($200,000.00) Dollars each.

COUNT VIII
BREACH OF THE DUTY OF FAIR REPRESENTATION
[Against AIR LINE PILOTS ASSOCIATION, INTERNATIONAL and LEE MOAK<br>as President of Air Line Pilots Association, International]
Damages Sought: At least $200,000 For Each Pilot

149. Plaintiffs repeat and reallege each and every allegation set forth in paragraphs "1" through "148" hereof, with like force and effect as though set forth at length herein.

150. The ALPA MEC intentionally interfered with the purpose and mission of the Merger Committee, which is intended pursuant to ALPA policy to act independently and authonomously.

151. In acting as it did, ALPA breached its duty of fair representation to its members by acting in a manner that was characterized by bad faith.

152. In acting as it did, ALPA breached its duty of fair

32

representation to its members by acting in a manner that was characterized by arbitrariness.

153.  By virtue of the foregoing, each plaintiff (and, for that matter, each AirTran pilot) has been damaged in a sum to be determined at trial but in no event less than Two Hundred Thousand ($200,000.00) Dollars each.

COUNT IX

BREACH OF THE DUTY OF FAIR REPRESENTATION
[Against AIR LINE PILOTS ASSOCIATION, INTERNATIONAL and LEE MOAK
as President of Air Line Pilots Association, International]
Damages Sought: At least $200,000 For Each Pilot

154.  Plaintiffs repeat and reallege each and every allegation set forth in paragraphs "1" through "**" hereof, with like force and effect as though set forth at length herein.

155.  The ALPA MEC intentionally thwarted the Merger Committee in its efforts to present to AirTran pilots pertinent information as to the first seniority integration package; to share with AirTran pilots the Merger Committee's enthusiasm for the seniority integration package; to share with pilots the remarks made by top Southwest officials at the July 14, 2011 meeting; and to educate the AirTran pilots as to the Merger Committee's reasons for favoring the package.

156.  In acting as it did, ALPA breached its duty of fair representation to its members by acting in a manner that was characterized by bad faith.

33

157.  In acting as it did, ALPA breached its duty of fair representation to its members by acting in a manner that was characterized by arbitrariness.

158.  By virtue of the foregoing, each affected AirTran plaintiff (and, for that matter, each AirTran pilot) has been damaged in a sum to be determined at trial, but in no event less than Two Hundred Thousand ($200,000.00) Dollars each.

*     *     *     *

WHEREFORE, Plaintiffs *pro se* CHRISTOPHER P. JAMISON, JOHN CARTWRIGHT, DAVID EDWARD MARCU, and TOMMIE D. BENEFIELD demand judgment against AIR LINE PILOTS ASSOCIATION, INTERNATIONAL and LEE MOAK, as President of Air Line Pilots Association, International, as follows:

(a)  On behalf of all plaintiffs, as to the claims set forth in Count I, as against Air Line Pilots Association, International and Lee Moak as President of Air Line Pilots Association, International, such sucm as may be determined at trial, but in no event less than the sum of Two Hundred Thousand ($200,000.00) for each plaintiff herein, plus the costs of maintaining this claim, including reasonable attorneys' fees;

(b) On behalf of all plaintiffs, as to the claims set forth in Count II, as against Air Line Pilots Association, International and Lee Moak as President of Air Line Pilots

Association, International, such sucm as may be determined at trial, but in no event less than the sum of Two Hundred Thousand ($200,000.00) for each plaintiff herein, plus the costs of maintaining this claim, including reasonable attorneys' fees;

        (c)   On behalf of all plaintiffs, as to the claims set forth in Count III, as against Air Line Pilots Association, International and Lee Moak as President of Air Line Pilots Association, International, such sucm as may be determined at trial, but in no event less than the sum of Two Hundred Thousand ($200,000.00) for each plaintiff herein, plus the costs of maintaining this claim, including reasonable attorneys' fees;

        (d)   On behalf of all plaintiffs, as to the claims set forth in Count IV, as against Air Line Pilots Association, International and Lee Moak as President of Air Line Pilots Association, International, such sucm as may be determined at trial, but in no event less than the sum of Two Hundred Thousand ($200,000.00) for each plaintiff herein, plus the costs of maintaining this claim, including reasonable attorneys' fees;

        (e)   On behalf of all plaintiffs, as to the claims set forth in Count V, as against Air Line Pilots Association, International and Lee Moak as President of Air Line Pilots Association, International, such sucm as may be

determined at trial, but in no event less than the sum of Two Hundred Thousand ($200,000.00) for each plaintiff herein, plus the costs of maintaining this claim, including reasonable attorneys' fees;

(f)  On behalf of all plaintiffs, as to the claims set forth in Count VI, as against Air Line Pilots Association, International and Lee Moak as President of Air Line Pilots Association, International, such sucm as may be determined at trial, but in no event less than the sum of Two Hundred Thousand ($200,000.00) for each plaintiff herein, plus the costs of maintaining this claim, including reasonable attorneys' fees;

(g)  On behalf of all plaintiffs, as to the claims set forth in Count VII, as against Air Line Pilots Association, International and Lee Moak as President of Air Line Pilots Association, International, such sucm as may be determined at trial, but in no event less than the sum of Two Hundred Thousand ($200,000.00) for each plaintiff herein, plus the costs of maintaining this claim, including reasonable attorneys' fees;

(h)  On behalf of all plaintiffs, as to the claims set forth in Count VIII, as against Air Line Pilots Association, International and Lee Moak as President of Air Line Pilots Association, International, such sucm as may be

determined at trial, but in no event less than the sum of Two

Hundred Thousand ($200,000.00) for each plaintiff herein, plus

the costs of maintaining this claim, including reasonable

attorneys' fees;

(i)   On behalf of all plaintiffs, as to the

claims set forth in Count IX, as against Air Line Pilots

Association, International and Lee Moak as President of Air Line

Pilots Association, International, such sucm as may be

determined at trial, but in no event less than the sum of Two

Hundred Thousand ($200,000.00) for each plaintiff herein, plus

the costs of maintaining this claim, including reasonable

attorneys' fees;

-   together with the costs and disbursements

of this action, applicable interest, attorneys' fees, and such

other and further relief as the Court may deem just and proper.


Dated: Atlanta, Georgia
       February 18, 2012




CHRISTOPHER P. JAMISON
7167 Valle D'Oro Ct.
Warrenton, Virginia 20186
(540) 341-2767
Fax: (540) 341-2767
E-Mail: cpjamison@hotmail.com

Plaintiff *Pro Se*

37

JOHN CARTWRIGHT
1901 Broadlands Drive
Watkinsville, GA 30677
(706) 207-5759
E-Mail: catwright1965@yahoo.com

Plaintiff *Pro Se*


DAVID EDWARD MARCU
1259 CR 473
Killen,Al. 35645

Plaintiff *Pro Se*


TOMMIE D. BENEFIELD, JR.
445 Monument Road, Apt. 1107
Jacksonville, Florida 32225

Plaintiff *Pro Se*