**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| CHRISTOPHER P. JAMISON, et al., | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:12-CV-00544-RWS |
| AIR LINE PILOTS ASSOCIATION, INTERNATIONAL and LEE MOAK, as President of Air Line Pilots Association, International, | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

**<u>ORDER</u>**

This case comes before the Court on Defendants' Motion for Summary

Judgment [21]. After reviewing the record, the Court enters the following

Order.

**<u>Background</u>[1]**

---

[1] Unless otherwise indicated, the Court relies on Statement of Undisputed Material Facts Submitted by Defendants Air Line Pilots Association, International, et al[.,] in Support of Summary Judgment. ("Defs.' SOMF," Dkt. [21-2].) If, however, a fact is disputed, the Court views all evidence and factual inferences in the light most favorable to Plaintiffs as the non-moving party, as the Court must on a motion for summary judgment. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

This case arises out of the merger between AirTran Airlines ("Airtran") and Southwest Airlines ("Southwest").  The merger precipitated integration of the two airlines' pilot seniority lists.  The parties agree that relative ranking on a seniority list is critically important to a pilot's employment conditions and opportunities.  This suit arises specifically out of the integration process of AirTran and Southwest's pilot seniority lists.

Plaintiffs[2] are pilots who were employed by AirTran at the time of the merger with Southwest.  (Compl., Dkt. [1] ¶ 3.)  In September 2010, Southwest announced an agreement to purchase AirTran's assets and equity.  (Def.'s SOMF, Dkt. [21-2] ¶ 6.)  In the merger, all AirTran pilots, including Plaintiffs, were represented by Defendant Air Line Pilots Association, International ("ALPA") while the Southwest pilots were represented by Southwest Pilots Association ("SWAPA").  (Id. ¶¶ 7-8.)  Plaintiffs bring their claims in this action based on ALPA's representation during the merger negotiations.[3]

---

[2] The original Complaint named four Plaintiffs: Christopher P. Jamison, John Cartwright, David Edward Marcu, and Tommie D. Benefield, Jr.  The Amended Complaint [10] added 116 additional Plaintiffs, as discussed *infra* at Part II.C.

[3] Because the parties do not distinguish between ALPA and Lee Moak in his capacity as President of ALPA, the Court treats the Defendants as one entity for the purposes of this Order.

The AirTran pilots' terms and conditions of employment were circumscribed by a collective bargaining agreement between AirTran and ALPA (the "AirTran Collective Bargaining Agreement"). (Id. ¶ 8.) Under the terms of the AirTran Collective Bargaining Agreement, a pilot's work opportunities–including domicile location, flying schedules, and furloughs–are determined by his seniority ranking. (Id.) The AirTran Collective Bargaining Agreement also provides that ALPA is governed by a Master Executive Council ("MEC"), comprised of AirTran pilots elected by the AirTran pilot membership. (Id. ¶ 12.) In addition, the AirTran Collective Bargaining Agreement states that the agreement shall bind any successor. (Id. ¶ 9.) When Southwest and AirTran merged, Southwest agreed to be bound by the AirTran Collective Bargaining Agreement. (Id. ¶ 10.)

Concurrent with the corporate merger negotiations and transactions, in the fall of 2010 ALPA and SWAPA entered into negotiations to combine the AirTran and Southwest pilot seniority lists. (Id. ¶¶ 13-14.) ALPA's MEC appointed a Merger Committee (the "AirTran Merger Committee") to act on its behalf in the negotiations. (Id.) Similarly, SWAPA appointed a Merger/Negotiations Committee (the "Southwest Merger Committee"). (Id.)

3

The AirTran and Southwest Merger Committees reached a "Process Agreement" on April 14, 2011.  (Id. ¶ 14.)  The Process Agreement provided three avenues for integration of the two seniority lists: (1) negotiations; (2) mediation, if negotiations failed; and (3) arbitration, if both alternatives failed.  (Id. ¶ 15.)  Southwest, as the acquiring entity, agreed to accept the integrated list created pursuant to the Process Agreement.  (Id.)

The two Merger Committees began to negotiate in the spring and summer of 2011, seeking resolution of a "complete agreement" that would be submitted to AirTran and Southwest's pilot memberships for a ratification vote.  (Id. ¶ 16.)  The governing provisions of AirTran and Southwest's Collective Bargaining Agreements required: first, negotiation by both Merger Committees to reach a tentative agreement; second, consideration and acceptance by the ALPA's MEC and its counterpart, SWAPA's Board of Directors; and third, if both governing bodies approved,[4] ratification by AirTran and Southwest's pilot groups.  (Id. ¶ 17.)  Southwest joined ALPA's and SWAPA's Merger

---

[4]  Plaintiffs submit that the AirTran Merger Committee was required to put *any* agreement reached through negotiations to a ratification vote.  (Pls.' Resp. to Defs.' SOMF, Dkt. [42-1] ¶ 17.)  Plaintiffs offer no support for this contention, which is discussed *infra* at Part II.B.2.

4

Committees in negotiations, and on July 12, 2011 presented a proposed

Comprehensive Agreement (the "First Proposed Comprehensive Agreement"),

which contained a proposed integrated seniority list and changes to the parties'

Collective Bargaining Agreements that included pay raises for the AirTran

pilots.  (Id. ¶ 19.)

The AirTran Merger Committee presented the First Proposed

Comprehensive Agreement to ALPA's MEC.  (Id. ¶ 20.)  ALPA's MEC

informed Southwest that the First Proposed Comprehensive Agreement was

unacceptable.  (Id.)

Following the informal rejection of the First Proposed Comprehensive

Agreement, Southwest and SWAPA requested a meeting with ALPA's MEC

and the AirTran Merger Committee.  (Id. ¶ 21.)  On July 14, 2011 in a meeting

held at Southwest's headquarters, Southwest officials presented the First

Proposed Comprehensive Agreement in hopes of convincing the AirTran

representatives to accept the proposal.  (Id. ¶ 22.)   Southwest CEO Gary Kelly

spoke about the First Proposed Comprehensive Agreement, but the parties

disagree about what Kelly said.

Defendants claim that Kelly "expressed (i) a desire to have the pilot group vote on an integration agreement, (ii) concerns with AirTran's Boeing 717 aircraft and possible future fuel cost increases, and (iii) an intent to integrate the two airlines."  (Id. ¶¶ 22-23.)  Plaintiffs, however, reference additional comments made by Kelly that AirTran representatives interpreted "as threats to [AirTran] pilot job security."  (Pls.' Mem. of Law in Opp'n to Defs.' Mot. for Summary J. ("Pls.' Opp'n Mem."), Dkt. [42] at 12; Pls.' Resp. to Defs.' SOMF, Dkt. [42-1] ¶ 22.)   Plaintiffs claim that Kelly made comments regarding: disfavor of the B717, which made up the majority of AirTran's fleet; a possible rescission of the proposal if a deal was not reached quickly; the possibility that a spike in fuel prices could prevent a later offer on these terms; and pay parity, claiming that pay increases for AirTran pilots would only be offered to avoid "labor strife."  (Pls.' Opp'n Mem., Dkt. [42] at 12-13.)  Most distressingly to Plaintiffs, Kelly made comments regarding a "Plan B," or the possibility that the two pilot groups would not be integrated or would only integrate through an arbitrated deal that would be less favorable to AirTran pilots.  (Id. at 13; Pls.' Resp. to Defs.' SOMF, Dkt. [42-1] ¶ 22.)  Even so, both

AO 72A
(Rev.8/82)

Plaintiffs and Defendants agree that Kelly's comments overall indicated that he and Southwest were in favor of integration and negotiation.

After the July 14 meeting, Southwest and AirTran's Merger Committees engaged in further negotiations with Southwest, reaching an Agreement in Principle on July 16, 2011 (the "Second Proposed Comprehensive Agreement"). (Defs.' SOMF, Dkt. [21-2] ¶ 28.) AirTran's Merger Committee considered the Second Proposed Comprehensive Agreement's seniority integration as less favorable to the AirTran pilots than that in the First Proposed Comprehensive Agreement. (Id. ¶ 29; Pls.' Resp. to Defs.' SOMF, Dkt. [42-1] ¶ 29.) The Second Proposed Comprehensive Agreement was, however, sufficiently counterbalanced by other terms such that AirTran's Merger Committee accepted the Second Proposed Comprehensive Agreement overall. (Defs.' SOMF, Dkt. [21-2] ¶ 29.)

AirTran and Southwest officials required that the Second Proposed Comprehensive Agreement be approved by both SWAPA's Board of Directors and ALPA's MEC before it could be submitted to the pilots for a ratification vote. (Id. ¶ 31.) The Second Proposed Comprehensive Agreement was converted into six separate documents ("Integration Agreement #1");

7

concurrently, one of the six documents entitled "Side Letter 9" was approved by SWAPA's Board of Directors.  (Id. ¶¶ 32-33.)  Side Letter 9 contained the integrated seniority list for the Southwest and AirTran pilots.  (Id. ¶ 33.)  After SWAPA's Board of Directors approved Side Letter 9, Southwest and AirTran pilots were able to see the integrated list.  (Id.)  The remaining documents of Integration Agreement #1 were provided to ALPA's MEC on August 10, 2011; AirTran pilots could view the documents online the following day. (Id. ¶ 34.)

In the days between reaching the Second Proposed Comprehensive Agreement in principle on July 16, 2011 and finalizing Integration Agreement #1's language on August 10, 2011, members of AirTran's Merger Committee and ALPA's MEC communicated with AirTran pilots in person, in online forums, and via phone and email regarding the proposed terms and whether the MEC should approve the agreements.  (Id. ¶¶ 35-37.) Again, without the MEC's approval, Integration Agreement #1 would not be submitted to the AirTran pilots for a ratification vote.  (Id. ¶¶ 39-40.)

ALPA's MEC met from August 16-18, 2011 to debate Integration Agreement #1.  (Id. ¶ 41.)  The meeting included closed sessions–attended only by ALPA's MEC, the AirTran Merger Committee, and advisors–and an open

8

session on August 17 attended by many AirTran pilots.  (See id. ¶ 41 (claiming

"several hundred" AirTran pilots attended); cf. Pls.' Resp. to Defs.' SOMF,

Dkt. [42-1] ¶ 41 (claiming around 200 of approximately 1700 AirTran pilots

attended the session).)  During the August 17 open session, the AirTran Merger

Committee briefed the pilots on Integration Agreement #1 and related issues.

(Defs.' SOMF, Dkt. [21-2] ¶ 42.)  Among the materials presented to the pilots

was a PowerPoint slide titled "Risk," which included the text: "Questions about

whether AirTran and Southwest operations would be integrated or whether the

integration could be delayed."  (Id.)

During both the periods from July 16 to August 10 and from August 16

to 18, AirTran pilots expressed varied opinions regarding Integration

Agreement #1.  (Id. ¶¶ 38, 43-44.)  ALPA's MEC members "held good faith

differences of views" about what a fair and equitable integration would look

like, whether Integration Agreement #1 should be submitted for a ratification

vote, and the significance of Kelly's comments at the July 14 meeting with

Southwest.  (Id. ¶ 44.)   On August 18, 2011, ALPA's MEC rejected Integration

Agreement #1 by a vote of 7-1.  (Id. ¶ 46.)  All eight voting members had been

present at the July 14, 2011 meeting with Kelly.  (Id.)

9

After ALPA's MEC rejected Integration Agreement #1, the AirTran Merger Committee prepared to continue working toward an integration agreement pursuant to the terms of the Process Agreement–first, negotiation; second, meditation; third, arbitration.  (Id. ¶ 47.)

On August 21, 2011, Southwest formally revoked its agreement to Integration Agreement #1.  (Id. ¶ 48.)  The next day, Kelly wrote in a letter to the AirTran and Southwest pilots that because the negotiations had failed to yield an agreement, "[Southwest] will continue to consider all other options, in addition to arbitration. . . . Simply put, reevaluating the integration plan is mandatory in this economic climate."  (Id. ¶ 49.)  In the days following, ALPA's MEC received numerous letters from pilots urging the MEC to quickly conclude an integration agreement and submit it to the pilots for a ratification vote.  (Id. ¶ 50.)  In response to the pilots, ALPA's MEC "passed a resolution to the effect that it would send out the second proposal for pilot ratification." (Pls.' Resp. to Defs.' SOMF, Dkt. [42-1] ¶ 50.)

On September 1, 2011, Southwest presented another proposal.  (Defs.' SOMF, Dkt. [21-2] ¶ 52.)  The revised integration agreement "made some improvements" to the integrated list, eliminated some of Integration Agreement

#1's conditions and restrictions benefitting AirTran pilots, and deferred

application of Southwest pay rates to AirTran pilots from April 2012 until

January 2015.  (Id.)  Accordingly, the revised integration agreement was not as

favorable to AirTran pilots as Integration Agreement #1.  (See Pls.' Resp. to

Defs.' SOMF, Dkt. [42-1] ¶ 52 ("The differences between the first and the

second proposals were that all of the beneficial Conditions & Restrictions were

gone from the second agreement, and seniority remained about the same as

under [Integration Agreement #1].")  Further, the revised integration agreement

*required* that ALPA's MEC submit the proposal to the pilots for a ratification

vote.  (Defs.' SOMF, Dkt. [21-2] ¶ 53.)

AirTran's Merger Committee presented Southwest's revised integration

agreement to ALPA's MEC.  (Id. ¶ 54.)  At a meeting of ALPA's MEC on

September 3, 2011, the MEC instructed AirTran's Merger Committee to

continue negotiating with Southwest.  (Id. ¶ 55.)  At that time, ALPA's MEC

committed to submit the finalized revised agreements ("Integration Agreement

#2") to the AirTran pilots for a ratification vote.  (Id.)  On September 20, 2011,

Southwest and AirTran finalized the language of Integration Agreement #2.

(Id. ¶ 57.)  On September 21, 2011, ALPA's MEC approved Integration

Agreement #2, and following that approval, the AirTran Merger Committee held "road shows" in which it presented Integration Agreement #2 to AirTran pilots. (Id.)

Also during September 2011, Southwest informed the AirTran Merger Committee "that Southwest had assigned several hundred individuals to work on development of a 'Plan B' that would be implemented if no consensual agreement was reached." (Id. ¶ 56.) The Atlanta-Journal Constitution published an article reporting on the development of "Plan B." (Id.)

In November 2011, AirTran and Southwest pilots voted to ratify Integration Agreement #2. (Id. ¶ 57.)

Plaintiffs Christopher P. Jamison, John Cartwright, David Edward Marcu, and Tommie D. Benefield, Jr. filed their Complaint in this Court on February 21, 2012. (Compl., Dkt. [1].) Plaintiffs amended their Complaint on August 31, 2012 to add 116 additional Plaintiffs. (Am. Compl., Dkt. [10].) Plaintiffs bring nine counts against Defendants ALPA and Lee Moak, as President of ALPA, for breach of duty of fair representation. Plaintiffs' allegations stem primarily from ALPA MEC's rejection of Integration Agreement #1 and its contemporaneous decision not to submit Integration

12

Agreement #1 to a pilot ratification vote.  Plaintiffs base their claims on the

following allegations:

- ALPA withheld information about the terms and conditions of Integration Agreement #1 in order "to prevent a groundswell of support" that would force a pilot ratification vote (Count I, Am. Compl., Dkt. [10] ¶¶ 229-235);

- ALPA deprived the AirTran pilots of the opportunity to vote for ratification of Integration Agreement #1 (Count II, <u>id.</u> ¶¶ 235(2)-240);

- ALPA's MEC intentionally withheld information about the First Proposed Comprehensive Agreement's seniority integration and about comments made by Southwest officials in order to prevent "AirTran pilots from fully understanding the risks associated with rejection of the seniority integration package" (Count III, <u>id.</u> ¶¶ 241-247);

- ALPA withheld and/or misrepresented comments made by Southwest executives, including CEO Kelly, at the July 14, 2011 meeting, thereby "lull[ing] the AirTran pilots into a false sense of security" (Count IV, <u>id.</u> ¶¶ 248-253);

- ALPA "deployed Todd Ortscheid, an Executive Vice President of the union, as a stalking horse to dissuade the MEC from putting out the seniority integration package for pilot ratification" (Count V, <u>id.</u> ¶¶ 254-260);

- ALPA's MEC "deliberately and intentionally disregarded viable and disinterested advice by counsel" to put Integration Agreement #1 to a pilot ratification vote (Count VI, <u>id.</u> ¶¶ 261-265);

-

13

- ALPA's MEC "deliberately and intentionally disregarded viable and disinterested advice by counsel" to advise AirTran pilots of the comments made by Southwest officials at the July 14, 2011 meeting (Count VII, id. ¶¶ 266-270);

- ALPA's MEC intentionally interfered with the AirTran Merger Committee, which was intended to act independently and autonomously (Count VIII, id. ¶¶ 271-275);

- and ALPA's MEC "intentionally thwarted" the AirTran Merger Committee's efforts to enthusiastically present Integration Agreement #1 to AirTran pilots, to inform pilots of the comments made by Southwest officials at the July 14, 2011 meeting, and to educate AirTran pilots about the Merger Committee's reasons for favoring Integration Agreement #1 (Count IX, id. ¶¶ 276-280).

Plaintiffs allege jurisdiction on the basis of 28 U.S.C. § 1331, 28 U.S.C.

§ 1337(a), the Labor Management Relations Act (29 U.S.C. § 141 *et seq.*), the

Labor Management Reporting Disclosure Act (29 U.S.C. § 401 *et seq.*), the

Railway Labor Act (45 U.S.C. § 151 *et seq.*), and 28 U.S.C. § 1367.  (Id. ¶ 1.)

Defendants now move for summary judgment on all Plaintiffs' claims.

## Discussion

## I.    Legal Standard - Summary Judgment

Federal Rule of Civil Procedure 56 requires that summary judgment be

granted "if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  "The moving

14

party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

The applicable substantive law identifies which facts are material.  Id. at 248.  A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law.  Id.  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

Finally, in resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296

15

(11th Cir. 2002).  But, the court is bound only to draw those inferences that are reasonable.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

## II.    Defendants' Motion for Summary Judgment [21]

In their Motion for Summary Judgment, Defendants argue that they are entitled to judgment as a matter of law on Plaintiffs' claims because ALPA did not breach its duty of fair representation and because the claims of all Plaintiffs added in the Amended Complaint are time-barred.  At bottom, Defendants assert that Plaintiffs cannot establish that ALPA's conduct was arbitrary or taken in bad faith such that it constitutes a breach of the duty of fair representation.  Plaintiffs respond in opposition.

16

The Court first lays out ALPA's duty of fair representation in the negotiations with Southwest and SWAPA on behalf of the AirTran pilots.  The Court then turns to Plaintiff's allegations, and considers whether any of Defendants' alleged conduct constitutes a breach of that duty.

A.     ALPA's Duty of Fair Representation

In 1926, Congress enacted the Railway Labor Act, 45 U.S.C. § 151 *et seq.*, for the following purposes:

> (1) To avoid any interruption to commerce or to the operation of any carrier engaged therein; (2) to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization; (3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this chapter; (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.

45 U.S.C. § 151a.  In 1936, the Act was extended to apply to the airline industry.  Delta Pilots, Inc., v. Air Line Pilots Ass'n, Int'l, 238 F.3d 1300, 1304 (11th Cir. 2001).  The Act's purposes "are facilitated by an elaborate statutory scheme designed to encourage negotiation and mediation rather than conflict

AO 72A
(Rev.8/82)

resulting in the interruption of interstate commerce." Int'l Ass'n of Machinists & Aerospace Workers v. Transportes Aereos Mercantiles Pan Americandos, S.A., 924 F.2d 1005, 1007 (11th Cir. 1991). The duty to bargain in good faith, imposed by 45 U.S.C. § 152, is "[e]ssential to this scheme," id., and is enforceable by courts. Delta Pilots, Inc., v. Air Line Pilots Ass'n, Int'l, 238 F.3d at 1304 (quoting Chicago & N.W. Ry. Co. v. United Transp. Union, 402 U.S. 570, 577 (1971)).

Implicit in the duty to bargain in good faith is a duty of fair representation. Steele v. Louisville & N.R. Co., 323 U.S. 192 (1944). Employee-plaintiffs must "carry the burden of demonstrating breach of duty by the Union." DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 164-65 (1983) (citing United Parcel Serv., Inc. v. Mitchell, 451 U.S. 56, 66-67 (1981)). Plaintiffs can carry this burden in one of three ways: A plaintiff must show that the defendant union acted in "bad faith," engaged in "arbitrary conduct," or demonstrated a "discriminatory" animus towards one group of represented employees. Air Line Pilots Ass'n v. O'Neill, 499 U.S. 65, 67 (1991). Because Congress intended for unions to enjoy "the wide latitude that negotiators need for the effective performance of their bargaining responsibilities," judicial

18

review is necessarily deferential to the union's performance.  Id. at 78.

Accordingly, a plaintiff cannot carry his burden simply by showing he is

unhappy with the results of the union's labor on his behalf.  A plaintiff must

instead provide material evidence that the union abused the broad discretion it

is afforded under the Railway Labor Act.

The Railway Labor Act imposes the duty of fair representation on a

union in its negotiating capacity, id. at 77, and it is ALPA's conduct during and

surrounding the integration negotiations that Plaintiffs challenge as a breach of

that duty.  Plaintiffs here do not allege that Defendants engaged in

discriminatory conduct in their negotiations with Southwest and SWAPA.

Rather, Plaintiffs' allegations rest on assertions that ALPA acted "in bad faith"

or "arbitrarily."

"A union acts in bad faith when it acts with an improper intent, purpose,

or motive."  Spellacy v. Airline Pilots Ass'n-Int'l, 156 F.3d 120, 126 (2d Cir.

1998) (citing Mock v. T.G. & Y. Stores Co., 971 F.2d 522, 531 (10th Cir.

1992)).  In addition to when it commits fraud or dishonesty, id. (citing Baxter v.

United Paperworkers Int'l Union, Local 7370, 140 F.3d 745, 747 (8th Cir.

1998),  a union may act "in bad faith" when it acts in an intentionally

19

misleading manner.   <u>Local No. 48, United Bhd. of Carpenters & Joiners of Am.</u>
<u>v. United Bhd. of Carpenters & Joiners of Am.</u>, 920 F.2d 1047, 1054 (1st Cir.
1990) (quoting Black's Law Dictionary 127 (5th ed. 1979)) (defining bad faith
as "generally implying or involving actual or constructive fraud, or a design to
mislead or deceive another, or a neglect or refusal to fulfill some duty or some
contractual obligation, not prompted by any honest mistake as to one's rights or
duties, but by some interested or sinister motive")).  This may include
withholding information from union members.  <u>See, e.g.</u>, <u>Orth v. Wisconsin</u>
<u>State Employees Union Counsel 24</u>, 546 F.3d 868, 874 (7th Cir. 2008)
(implying bad faith where the union's agent concealed from the union's
members an oral agreement that he had made with the employer);  <u>Lewis v.</u>
<u>Tuscan Dairy Farms, Inc.</u>, 25 F.3d 1138, 1145 (2d Cir. 1994) (bad-faith
concealment of an oral agreement violated the duty of fair representation).

     A union's actions are arbitrary only if its "behavior is so far outside a
'wide range of reasonableness' as to be irrational."  <u>Air Line Pilots Ass'n Int'l</u>
<u>v. O'Neill</u>, 499 U.S. at 67 (quoting <u>Ford Motor Co. v. Huffman</u>, 345 U.S. 330,
338 (1953)).  The inquiry must be made "in light of the factual and legal
landscapes at the time of the union's actions."  <u>Id.</u>  "This 'wide range of

reasonableness' gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong." Marquez v. Screen Actors Guild, Inc., 525 U.S. 33, 45-46 (1998).  Keeping in mind the Court's deferential posture, an agreement reached by a union "is not irrational simply because it turns out *in retrospect* to have been a bad" agreement.  Air Line Pilots Ass'n Int'l v. O'Neill, 499 U.S. at 79 (emphasis in original).

> B.    The Parties' Arguments

Defendants move the Court for summary judgment on grounds that the undisputed material facts demonstrate that ALPA's actions were not taken in bad faith and were within the broad discretion of afforded to unions under the Railway Labor Act.  Further, Defendants state that Plaintiffs cannot show the requisite causation between ALPA's actions and any injuries suffered by Plaintiffs.

The Court reads Plaintiffs' nine Counts as alleging essentially two ways that Defendants breached the duty of fair representation: first, that ALPA acted in bad faith by either failing to disclose or misrepresenting information to AirTran pilots about Integration Agreement #1 and comments made by Southwest officials regarding the integration process; and second, that ALPA

21

acted arbitrarily by not submitting Integration Agreement #1 to a pilot

ratification vote and thereafter approving a less favorable integration agreement.

The Court considers each allegation in turn.

### 1.    Bad Faith: Failure to Disclose or Misrepresentation

Plaintiffs claim that Defendants breached their duty of fair representation

when ALPA's MEC withheld information from AirTran pilots about the First

Proposed Comprehensive Agreement, the terms and conditions of Integration

Agreement #1, and the comments made by Southwest CEO Kelly and others at

the July 14, 2011 meeting.  Plaintiffs argue that these non-disclosures were

intended to prevent AirTran pilots from understanding the risks associated with

rejecting the proposed integration package and to lull the pilots into a false

sense of security.  Plaintiffs claim that these non-disclosures and

misrepresentations affected the outcome of ALPA's MEC's vote on Integration

Agreement #1 by preventing a "groundswell of support" from the AirTran

pilots that would have forced a ratification vote.  Defendants argue that bad

faith cannot provide a basis for Plaintiffs' claims because Plaintiffs cannot show

that any failure to disclose or misrepresentation demonstrably affected the

outcome of ALPA's MEC's vote on Integration Agreement #1.  The Court agrees.

Plaintiffs must establish a causal relationship between the alleged misrepresentations to pilots and their injury.  See, e.g., Acri v. Int'l Ass'n of Machinists & Aerospace Workers, 781 F.2d 1393, 1397 (9th Cir. 1986); Brown v. UAW, 689 F.2d 69, 71 (6th Cir. 1982).  Plaintiffs offer evidence of a "straw poll" that indicated the MEC would have approved Integration Agreement #1, which would have then sent the Agreement to pilots for a ratification vote. (Pls.' Opp'n Mem., Dkt. [42] at 28-29.)  Plaintiffs further argue that the pilots would have ratified Integration Agreement #1, given the pilots' ratification of Integration Agreement #2, which was an "inferior" plan.  (Id.)  But the Court does not even reach the question of whether the pilots would have ratified Integration Agreement #1, because the flaw in Plaintiffs' argument lies earlier in the chain of causation.

Plaintiffs' bad faith claim is based on their assertion that Defendants failed to disclose the comments made by Southwest CEO Gary Kelly and others at the July 14, 2011 meeting.  Because ALPA did not publicize Kelly's comments regarding a "Plan B" or the possibility of non-integration, Plaintiffs

argue that ALPA "lulled" AirTran pilots into a sense of false security.

Moreover, because ALPA did not circulate the terms and conditions of

Integration Agreement #1, Plaintiffs argue that ALPA prevented a "groundswell

of support" that would have forced a ratification vote.  Essentially, Plaintiffs

argue that by withholding information from AirTran pilots, ALPA (1) prevented

reactions and communications from pilots that (2) would have convinced the

ALPA MEC to approve Integration Agreement #1, which (3) would have then

been submitted to a pilot vote and (4) been ratified.  This chain of causation is

too attenuated.  Additionally, ALPA's MEC voted 7-1 against Integration

Agreement #1, and all voting members of the MEC were present at the July 14,

2011 meeting with Kelly.[5]  A reasonable trier of fact could not find for

Plaintiffs here.

　　　　As discussed above, the Court's role in review of union conduct is

limited.  While the Court construes the evidence in favor of Plaintiffs as the

---

[5] Plaintiffs have raised concerns about the participation of Todd Ortscheid, an
AirTran pilot and an Executive Vice President with ALPA National.  (See Pls.' Opp'n
Mem., Dkt. [42] at 16-21.)  The Court agrees with Defendants' position that
Ortscheid's involvement in the integration debate was simply that of an AirTran pilot
exercising his rights of expression.  As such, Plaintiffs' allegation that Ortscheid was
employed as a "stalking horse" cannot provide the basis for a cause of action for
breach of the duty of fair representation.

24

non-moving party, there is no genuine issue of material fact related to Plaintiffs' claims of a bad faith breach of the duty of fair representation.

>     2.     *Arbitrary conduct*

The Court now turns to consider whether the evidence could support Plaintiffs' claim that ALPA acted arbitrarily when it did not submit Integration Agreement #1 to AirTran pilots for a ratification vote.  Defendants argue it cannot, because ALPA's MEC members were simply "called upon to exercise their judgment to assess whether, in their view, the best interests of the AirTran pilots would be served by approving the proposed agreements."  (Defs.' Mem., Dkt. [21-1] at 34.)  The Court agrees.  Under the standard articulated above in Part II.A, ALPA's decision not to submit Integration Agreement #1 to the AirTran pilots for a ratification vote is far from arbitrary.

Defendants complied with the procedures set forth in the Process Agreement as related to ratification of a negotiated agreement.  The Process Agreement provides that: "SWAPA and ALPA agree to submit the complete agreement to their respective memberships for ratification."  (Defs.' Ex. 4, Dkt. [21-7] at 5.)  ALPA's policy requires the MEC to "sign off on any vote that's to be taken by the pilots."  (Early Dep. 28:4-5, Dkt. [21-5] at 267.)  Plaintiffs

appear to assert that the MEC was required to submit any agreement to its membership for ratification, but point to no evidence in support of this contention.  (Pls.' Resp. to Defs.' SOMF, Dkt. [42-1] ¶ 17.)  Rather, Plaintiffs claim that no evidence shows that the MEC was *not* required to submit the agreement to a ratification vote.  (Id. (citing to Sullivan Dep., 65:18-66:1, Dkt. [39] at 65-66 (Q: "Do you have an understanding as to whether the process agreement required a pilot ratification vote? . . . Required that any resultant agreement be put out to the pilots for ratification?" A: "Yes, I believe so.  I don't know if that's specifically spelled out in the process agreement.  I'm going to have to look at it.").)  Plaintiff must do more than create "metaphysical doubt" as to the facts.  Matsushita, 475 U.S. at 586.

Even if Integration Agreement #2, which was ratified, was an inferior agreement, the Court cannot conclude that Defendants acted arbitrarily in rejecting Integration Agreement #1.  While it is not the Court's place to inquire into the judgment calls made by ALPA in its negotiations on Plaintiffs behalf, the Court can imagine that ALPA may have rejected Integration Agreement #1 after concluding that the benefits and conditions offered in that first proposal did not outweigh the proposed seniority list, which could have been seen as

26

unfavorable to the AirTran pilots.  A union must be allowed a "wide range of reasonableness."  Ford Motor Co. v. Huffman, 345 U.S. 330, 338 (1953).

Moreover, circumstances changed between the MEC's rejection of Integration Agreement #1 and may have contributed to the pilots' ratification of the less favorable Integration Agreement #2.  After Integration Agreement #1 was rejected, Southwest CEO Gary Kelly wrote an open letter to AirTran and Southwest pilots that mentioned the possibility of arbitration.  Additionally, Southwest's exploration of a "Plan B" that may have not included integration at all was publicly reported in the Atlanta Journal-Constitution.  These factors, as well as simply the passage of time, may have encouraged the pilots to ratify Integration Agreement #2.  Again, evidence that the ultimate deal is less favorable than earlier proposals does not independently support a claim for breach of the duty of fair representation.  Marquez v. Screen Actors Guild, Inc., 525 U.S. at 45-46; Air Line Pilots Ass'n Int'l v. O'Neill, 499 U.S. at 79.

Accordingly, no reasonable trier of fact could find for Plaintiffs on this record.  Because there is no genuine issue of material fact for trial, Defendants are entitled to summary judgment on Plaintiffs' claims.  Defendants' Motion for Summary Judgment is therefore **GRANTED**.

C.      Additional Plaintiffs Named in the Amended Complaint [10]

As set forth above, the Court has ruled for Defendants on the merits of their Motion to Dismiss.  Accordingly, Defendants' contention that the additional Plaintiffs named in the Amended Complaint [10] should be denied relief because their claims do not relate back to the original Complaint is **MOOT**.

## Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment [21] is **GRANTED**.  The Clerk is **DIRECTED** to close the case.

**SO ORDERED**, this   31st   day of March, 2015.

**RICHARD W. STORY**
United States District Judge